**ROBERT PETHERS,**

                    **Plaintiff,**                **No. 09-CV-10516**

**vs.**                                   **Hon. Gerald E. Rosen**

**METRO LIFT PROPANE, et al.,**

                    **Defendants.**

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on         July 29, 2010

PRESENT:   Honorable Gerald E. Rosen
                      United States District Chief Judge

## I.  INTRODUCTION

The above-captioned Whistleblowers Protection Act/Worker's Compensation retaliation action is presently before the Court on Defendants' Fed. R. Civ. P. 56 Motions for Summary Judgment.  Plaintiff has responded to Defendants' Motions and Defendants have replied.  Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that oral argument is not necessary.  Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), this matter will be decided on the briefs.  This Opinion and Order sets forth the Court's ruling.

## II.  FACTUAL BACKGROUND

Plaintiff Robert Pethers is a former employee of Heritage Operating L.P. d/b/a

Metro Lift Propane ("Heritage").  Heritage is a national propane distributor with facilities

in Belleville and Milford, Michigan which service the Metropolitan Detroit area (the

"Detroit District").  Drivers in the Detroit District deliver propane cylinders to businesses

throughout the Metro-Detroit area which use the propane cylinders to power hi-los and

other industrial equipment.

Defendant Tom Stikeleather is the Regional Manager overseeing the Detroit

District and several other facilities in the Northeast United States.  Defendant Mark

Austin was the manager of the Detroit District until late July 2008 when he was

transferred to another Heritage facility in Cincinnati, Ohio.  After Austin's transfer,

Defendant Martin McNulty became the District manager.  Austin and McNulty reported

to Tom Stikeleather.

Heritage hired Robert Pethers on February 28, 2008 as a driver in the Detroit

District.[1]  Pethers worked at Heritage for a total of eight months until his employment

was terminated on October 24, 2008 for poor work performance, dishonesty, and

insubordination.  *See* Affidavit of Tom Stikeleather, Defendant's Ex. 1, ¶ 13.

Upon his hire, Plaintiff received Heritage's "Code of Business Conduct" for which

he signed an acknowledgment of receipt.  *See* Defendant's Ex. 5.  In pertinent part, the

---

[1]  While working as a driver, Pethers worked out of the company's Belleville
facility.

Code provides:

> If you become aware of any conduct that is contrary to our values or any laws, regulation or policies under which we operate, please bring such conduct to the attention of whatever level of management you feel comfortable approaching. Our employee handbook provides guidance for certain situations but you may call a Confidential Report Line at 1-800-544-7389. Calls to the helpline go to a third party and will be completely anonymous.

*Id.*[2]

It is undisputed that Plaintiff never took advantage of these procedures while employed with Heritage.

Each day, Heritage provided its drivers with printouts of their predetermined routes. These driver routes were prepared in advance by the District Manager and stored in a computer located in the office. Drivers are not permitted to alter routes without authorization. [Affidavit of Mark Austin, Defendant's Ex. 2, ¶ 3.]

In July 2008, Mark Austin discovered that Plaintiff had gone into the computer and altered his route by assigning several of his stops to another driver. *Id.*; *see also* Plaintiff's Dep., pp 107, 130.[3] Austin and Martin McNulty, who, at the time was

---

[2] Heritage's records also indicate that Plaintiff received a copy of the Employee Handbook but he failed to sign an acknowledgment of receipt of it. *See* Defendant's Ex. 4. (Plaintiff maintains that he never received a handbook.)

[3] Plaintiff testified that he only "fixed" his route because he believed that since he was assigned certain stops that were previously serviced by another driver, Jimmy, and because John Hill, another driver, had started running Jimmy's old route, it was okay for him take Jimmy's old stops off of his route and give them to John Hill. *See* Plaintiff's Dep. p. 130. (In response to Plaintiff's motion for summary judgment and more than three months after Plaintiff's deposition, Plaintiff submitted an affidavit contradicting his

shadowing Austin as part of his training for a management position, immediately met with Plaintiff to discuss his unauthorized computer use and reiterated that drivers were not permitted to their change routes.  Austin Aff., ¶ 3; Plaintiff's Dep., p. 107.

At around the same time in July 2008, Austin announced that he was transferring to Heritage's Cincinnati facility.  After learning of Austin's impending transfer, Plaintiff, who by then had been with the company for barely five months, called Tom Stikeleather and informed him that he was interested in the Detroit District Manager position held by Austin.  Plaintiff's Dep., p. 77.  Stikeleather informed Plaintiff that a replacement for Austin had already been determined.  *Id.*, pp. 79-80.  Stikeleather further informed Plaintiff that the company's policy was that an employee had to work for some time in sales and succeed in that position before he or she would be considered for a manager's position.  *Id*. pp. 77-78; Stikeleather Aff., ¶ 6.  Stikeleather asked Plaintiff whether that was something he was interested in pursuing, and after discussing the matter with his wife, Plaintiff informed Stikeleather that he was interested.  Plaintiff's Dep., p. 78.  Shortly thereafter, Plaintiff transferred from his driver position to sales.  *Id.* pp. 79-80.

_____

deposition testimony.  However, it is well-settled that "[w]hen a motion for summary judgment has been filed, a party cannot create a factual issue by filing an affidavit which contradicts earlier testimony."  *Lanier v. Bryant* 332 F.3d 999, 1004 (6th Cir.2003) (citations omitted); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (1986).  *See also Lockard v. General Motors Corp.*, 52 Fed.Appx. 782, 789 (6th Cir.2002) ("[A] party may not create a genuine issue of material fact to defeat summary judgment by filing an affidavit that conflicts with prior deposition testimony.")  Plaintiff's affidavit testimony, therefore, will be disregarded.)

The Friday before Plaintiff started in sales, Plaintiff alleges that he injured his arm putting a cylinder in a cage. *Id.* at 103. Plaintiff testified that he did not report this injury to anyone at Heritage at the time. *Id*. at 104. It was not until Tuesday of the next week (after Plaintiff had begun in sales) that he mentioned it to Martin McNulty and Mark Austin. *Id.* at 105. On that Tuesday, Plaintiff told McNulty and Austin about his arm but said "I think it's just a pulled muscle and it won't affect me with sales. I just don't think I can lift cylinders right now." *Id.* at 106. Plaintiff testified that when he told McNulty and Austin about his arm, McNulty directed him to go to a doctor and get it looked at. *Id.* at 109. According to Plaintiff, he was not directed to go to a company doctor or any particular clinic, so he went to the Urgent Care in Mason, Michigan, where his family had treated previously. *Id.*

Plaintiff never filed a workers' compensation claim. Although Plaintiff testified that McNulty and Austin told him that he needed to fill out an incident report, he claims he was never provided with one to fill out. *Id.* Plaintiff claims that McNulty told him that the company "would never pay a dime" on his injury. *Id.* at 106. However, no bill for treatment was ever sent to Heritage and the bill for medical treatment from Urgent Care of Mason indicated that Plaintiff listed "Pennington Gas" (Plaintiff's former employer) as his employer at the time his injury. *See* Defendants' Ex. 7.

Plaintiff began his sales position the first week of August 2008. Upon starting in sales, Mark Austin informed Plaintiff of the requirements of the position, including

Heritage's requirement that sales people obtain a minimum of ten new customers per month. Plaintiff's Dep., p. 80. According to Defendant, Plaintiff did not meet his minimum sales quotas and was not a successful salesperson. Stikeleather Aff., ¶ 7.

On September 25, 2008, an error was discovered on one of Plaintiff's customer's invoices. Martin McNulty, who by this time had assumed Mark Austin's management duties, instructed Plaintiff to go to the Belleville office the next morning, September 26, to pick up a corrected invoice, take it to the customer, and have it signed. Plaintiff's Dep., pp. 119-120.

Plaintiff testified that, on September 26, he left the company truck he was assigned at home and decided, instead, to ride his motorcycle to Belleville. *Id.* pp. 124-126. When he appeared at the Belleville office Plaintiff was wearing biker gear, i.e., motorcycle helmet, riding chaps, and leather jacket. Plaintiff's Dep. p. 124. After the corrected invoice was prepared, Plaintiff said that he and Chris Lopez, another driver,[4] went out for lunch. *Id.* p. 121. He testified that he had intended to go to his mother-in-law's house in Howell, change his clothes, and take the ticket to the customer's office (which was near his in-laws' home), but "there was some confusion" when he and Chris were getting ready to leave the Belleville office for lunch and, as a consequence, the ticket got left behind. *Id.* p. 122. Rather than return to the Belleville office after lunch, Plaintiff decided to wait until Monday to return to Belleville get the ticket and get it

---

[4] Chris Lopez, was a regular driver, but according to Plaintiff, he also had some unspecified lead driver duties [*see* Plaintiff's Dep. p. 28, 71].

signed by the customer.  *Id.* pp. 122-23.  Plaintiff did not return to work the afternoon of September 26.[5]

On October 1, McNulty and Stikeleather met with Plaintiff at the Milford facility. [Stikeleather Aff., ¶ 8.] They confronted Plaintiff about his having appeared arrived at the Belleville facility in biker gear and about never going to the customer's office that afternoon to have the invoice signed.  *Id.*  Plaintiff was removed from his sales position and placed on a 90-day probation, with a warning that any further misconduct would result in termination.  *Id.*  Plaintiff was returned to a driver position, but without a permanent route; for the next several weeks, Plaintiff filled in for drivers who were absent or on vacation.  [Plaintiff's Dep., pp. 127-28]

On October 22, 2008, Plaintiff was caught accessing a company computer at the Belleville facility changing driver routes.  [Stikeleather Aff., ¶ 10.]  There was a mandatory, paid-time safety meeting scheduled for all drivers the next day, October 23rd. *Id.* ¶ 12.  Having learned that Plaintiff had again altered driver routes, McNulty called Plaintiff on October 22, and instructed him to arrive at least one hour before the meeting for a one-on-one personal meeting with him to discuss Plaintiff's future employment at

---

[5]  Plaintiff claimed that others previously in sales had told him that it was useless to make sales calls on Friday afternoons and since he purportedly called on some customers (whom he could not identify in his deposition) before going to Belleville the morning of September 26th, he did not think there was anything wrong in not returning to the office that afternoon.  *See* Plaintiff's Dep. pp. 123-126.  He testified that had he not been instructed to go pick up the ticket, he would simply have done what he normally did on Friday afternoons -- i.e., spend the afternoon at home where he would go over his week's calls, send out follow-up e-mails, and start planning for the next week.  *Id.* p. 126.

Heritage. Plaintiff's Dep. p. 170.[6] Despite having been instructed to show up early, Plaintiff did not show up for the one-on-one meeting and came 45 minutes late for the drivers' meeting. *Id.* 171-72.[7] Therefore, the one-on-one meeting with McNulty was held after the drivers' meeting. Plaintiff recorded this meeting.[8] [This recording was transcribed by a court reporter on October 8, 2009 and a copy of the transcript is appended to Defendants' Brief as Ex. 6.]

When they met one-on-one, McNulty told Plaintiff that, because of his repeated problems, he was not going to return him to driving and that he was having a difficult time deciding what to do with him. [Tape Tr., pp. 4, 7.] Initially, McNulty told him to return to Milford at 10:00 a.m. Monday morning (October 27) and McNulty would decide by then whether Plaintiff would be placed as a bottle filler or whether he would be terminated. [*Id.*, p. 7-8] McNulty reviewed with Plaintiff his various misconduct issues (i.e., unauthorized use of the computer, appearing for work in biker gear, not having the corrected customer's invoice signed when directed, showing up late for the scheduled one-on-one meeting), but when Plaintiff challenged McNulty's determination as to the

---

[6] Plaintiff recalls the dates as having been October 23rd and 24th. Plaintiff's Dep. p. 169.

[7] According to Plaintiff, he was late because Chris Lopez had directed him to make an unscheduled stop to pick up some cylinders from a customer's facility. *Id.* p. 171. He did not, however, call McNulty or anyone else at Heritage to say he was running late.

[8] Plaintiff testified that he recorded most meetings. *Id.* p. 172.

seriousness of any his actions, McNulty decided to terminate Plaintiff's employment

immediately. *Id.* at 15-18. He told Plaintiff:

> . . . So here's where we're at, Rob. Just this conversation we had -- I can't use you. There is nowhere I can put you. I was going to hope that you could come in here, I could sit down with you. That's why I wanted this -- I wanted you in earlier. . . .

> . . . What you don't get is, I'm instructing you to come in and I told you, even if you have to push something off till [sic] Monday, do that. So what did you do? You do what Rob always does. You do what you want to do. You didn't call me up and say, Marty, I'm running late. I know you want this; I know you want that.

> You came in when you wanted to. That's why, Rob, I'm terminating you, because I can't work with you. Even right now, I can't work with you. talking to you, you -- you say what you want. Facts mean nothing [to you]. So -- we're done. . . .

> . . . You can come in here Monday at 10:00 if you want. Whenever your heart feels good, I will have it in writing for you. . . .

> . . . Because this is done. There is nothing I can do.

*Id.* pp. 18-19.

After he was fired, Pethers filed a complaint with the U.S. Department of Labor,

Occupational Safety and Health Administration ("OSHA") on November 6, 2008,

alleging discrimination under Section 31105 of the Surface Transportation Assistance

Act, 49 U.S.C. § 31105. [*See* Complaint, Ex. 1][9] There is no evidence, however, that

McNulty or Stikeleather or anyone else in management at Heritage knew of Plaintiff's

---

[9] This exhibit is OSHA's acknowledgment of receipt of Plaintiff's complaint. No copy of the complaint itself or its contents has been provided to the Court. Nor has the Court been apprised of the disposition of Plaintiff's complaint.

intent to file a complaint prior to his discharge.

Plaintiff testified that, prior to his discharge, he and five or six of his fellow drivers complained almost daily amongst themselves about "some of the things that were going on" at work, the "things being said from management about firing people," and the "harassment going on at that time."  Plaintiff's Dep. pp. 141-42; 186.  According to Plaintiff, in these discussions, the drivers wondered where they could report the "violations and harassment."  *Id.* at 143.  Plaintiff testified that he told the other drivers that "[he] was going to look into seeing what [he] could do,"  *id.* at 186, but he never told anyone in management he was going to file a complaint, and did not know whether anyone else at the company knew that he and the drivers were discussing the possibility. *Id.* at 187.  It was not until after he was fired and did some investigating on-line that he decided to file a complaint with OSHA.  *Id.* at 141.

On January 6, 2009, Plaintiff instituted the instant action in the Wayne County Circuit Court.  In his Complaint, Plaintiff alleges claims of age and race discrimination, harassment, hostile work environment and retaliation in violation of the Michigan Elliott-Larsen Civil Rights Act (Counts I and II); retaliatory termination in violation of the Michigan Whistleblower's Protection Act (Count III); wage and hour violations pursuant to the Fair Labor Standards Act and M.C.L. § 408.384(a) (Count IV); failure to provide required documents in violation of Comprehensive Omnibus Budget Reconciliation Act ("COBRA") (Count V); and workers' compensation retaliation (Count VI).  Defendants'

timely removed the action to this Court on federal question grounds.

Discovery has now closed and Defendants move for summary judgment on all of Plaintiff's claims. Plaintiff responded to Defendants' motions and, in his Response, concurs in the dismissal of his Elliott-Larsen claims. Therefore, Plaintiff's claims in Counts I and II of his Complaint will be dismissed. This leaves only Plaintiff's Whistleblower's Act, FLSA, COBRA, and workers' compensation retaliation claims to be adjudicated.

## III. DISCUSSION

## A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c)(2).

As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp*., 434 F.3d 810, 813 (6th Cir. 2006). However, the nonmoving party "may not rely merely on allegations or

denials in its own pleading," but "must -- by affidavits or as otherwise provided in [Rule 56] -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2). Moreover, all affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack*, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find" for the nonmoving party, the motion should be granted.  *Matshushita Elec. Indus. Co., Ltd. v. Zenith Radio Co.*, 475 U.S. 574, 587 106 S.Ct. 1348, 1356 (1986); *Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996).

**B.      PLAINTIFF HAS FAILED TO MAKE OUT A WHISTLEBLOWER'S PROTECTION ACT CLAIM**

The Michigan Whistleblower's Protection Act, M.C.L. § 15.361 *et seq.,* (the "WPA") provides, in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

M.C.L. § 15.362.

Michigan courts have clarified that WPA claims are to be analyzed under the burden-shifting framework used in retaliatory-discharge claims brought under the Elliott-Larsen Civil Rights Act. *See Roulston v. Tendercare (Michigan), Inc*., 239 Mich.App. 270, 280-281, 608 N.W.2d 525 (2000); *Anzaldua v. Band*, 216 Mich. App. 561, 550 N.W.2d 544, 552-53 (1996). The plaintiff must first make a *prima facie* showing that his termination was retaliatory. *Roulston, supra*. The burden then shifts to the defendant to provide a legitimate, nonretaliatory explanation for terminating the plaintiff's employment. *Id.* The plaintiff must then prove that the defendant's articulated reason was not the real reason for the termination but only a pretext. *Id.*

To establish a *prima facie* case under the WPA, a plaintiff must show that (1) he engaged in a protected activity as defined by the Act; (2) the defendant discharged him; and (3) a causal connection exists between the protected activity and the discharged. *Chandler v. Dowell Schlumberger, Inc.*, 456 Mich. 395, 399, 572 N.W.2d 210, 212 (1998).

A "protected activity" under the WPA consists of (1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation. M.C.L. § 15.362; *Chandler, supra*. Plaintiff readily admits that he did not report a violation or suspected violation of law during his employment at Heritage. [*See* Plaintiff's Dep., pp. 141, 143.] Rather, his claim is predicated upon the protection

afforded under the Act for being "about to report" a suspected violation.

To establish a claim under the "about to report" prong of the statute, a plaintiff must show (1) by *clear and convincing evidence* that he or a person acting on his behalf was about to report a violation or suspected violation of a law, *see* M.C.L. § 15.363(4) (emphasis added); *Shallal v. Catholic Social Services*, 455 Mich. 604, 566 N.W.2d 571, 575 (1997); and (2) that the person who fired him was aware that he was about to make a report before he was fired. *Kaufman & Payton PC v. Nikkila*, 200 Mich. App. 250, 247-58, 503 N.W.2d 728 (1993); *Saloka vv. Shelby Nursing Center Joint Venture*, 2005 WL 3304596 (Mich. App. 2005), *lv. denied*, 475 Mich. 889 (2006); *Jennings v. County of Washtenaw*, 475 F. Supp. 2d 692, 711 (E.D. Mich. 2007). An employee who is "about to report" a violation or a suspected violation is one who "is on the verge of" doing so. *Shallal, supra*, 566 N.W. 2d at 575. "[T]he language of the Whistleblowers' Protection Act intentionally reduces employee protection the more removed the employee is from reporting to a public body." *Id.* at 576.

Thus, to make out his WPA claim in this action, Plaintiff Pethers must present evidence showing that he "was on the verge" of filing an OSHA complaint while he was still employed, and that the person who fired him -- Martin McNulty -- was aware that he was about to file a complaint. The evidence presented by Plaintiff is insufficient to make these showings.

Plaintiff testified in his deposition that he only had general discussions with co-workers kicking around the idea of whether a law might have been violated. He testified:

Q: Did you ever tell [co-worker] John Hill that you were going to file a Complaint?

A: I do not recall if I told him I was going to file a Complaint. But *we had discussions, John and me and Chris Lopez, possibly some of the other drivers, about some of the things that were going on, and where to go with it.* You know, who -- basically kind of [] questioning conversations to -- none of us really knew what agency [to go] to, or who [to go] to in the company. . . .

Q: And, did you know who you were going to file a Complaint with?

A: Not until after I had done some investigating after I was fired. . . . After I did some investigating on-line.

Q: And when you said that you possibly talked with other drivers, who were they?

A: It could include all the drivers that were present -- any and up to all of the drivers that were presently working for Metro Lift. When we were getting ready to go out in the morning, there were discussions. The morning that I drove the box truck that they had rented, there were discussions with some of the drivers on that morning. After -- after that, when -- the next day, I believe, John got pulled over in the box truck and got cited, that Thursday and Friday, there was a lot of discussions because there was a lot of things being said from management about firing people, backdating DVR's, having to come out on your own time and fill them -- fill them out. A lot of -- lot of harassment going on at that time.

Q: Okay. Do you know, other than John Hill, what drivers you're talking about who were there?

A: As I said, it could be -- it could have been any of them standing there. *It was conversation just between all the drivers* in the morning. It could have been all of us standing there, it could have been three or four of us standing there. I don't recall exactly who was standing around at every conversation. . . .

* * *

Q:      Okay.  You never reported to a public agency or body until after you were terminated, correct?

A:      Correct.

* * *

Q:      Other than talking to drivers about saying this is wrong, did you specifically tell anyone that you were going to file a Complaint with a public body or agency?

A:      When I had the conversation with Chris Lopez the week before I was fired, and with [other] drivers, there was talk about filing a Complaint and who it should be with. . . .

Q:      And was that with respect to the harassment that you were talking about. . . ?

A:      . . . It was everything.  We discussed all issues that we were facing during that time period.

Q:      And all the drivers were saying they were going to file a Complaint?

A:      No, that's not what I said.  I said *it was discussed about the possibility* of filing a Complaint, and who those complaints should be made to.

* * *

Q:      From those conversations, the drivers that were there talking, it's something needs to be done but I wonder where we should go. But did you tell anyone in those meetings that I'm going to go report the company. . . .?

A:      *I told them I was thinking about it.*  I do not recall if I said I was definitely going to.  I did make a comment that I was going to look into seeing what I could do.

[Plaintiff's Dep., pp. 140-143, 184-186].

As indicated above, the WPA specifically provides that "about to report" claims require "clear and convincing evidence." *See* M.C.L. § 15.363(4). In opposing a motion for summary judgment, "any heightened burden of proof required by the substantive law for an element of the respondent's case. . . must be satisfied by the respondent." *Street v. J.C. Bradford & Co.*, 886 F. 2d 1472, 1479 (6th Cir. 1989); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513 (1986) ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.") Plaintiff's deposition testimony that he and his co-workers had discussions about the possibility of filing a complaint somewhere does not satisfy his evidentiary burden under the WPA to show by "clear and convincing evidence" that he was about to report a suspected violation to a public body before he was terminated.

However, assuming *arguendo* that Plaintiff has satisfied his burden to show that he was "about to" file an OSHA complaint, an "about to report" claim also requires evidence showing that, before firing him, the person responsible for his termination was aware that he was about to make a report to a public body. *Kaufman & Payton, supra; Saloka, supra*. Plaintiff here cannot make this showing.

Employers are entitled to objective notice of a threat to report by a whistleblower, *Kaufman & Payton, supra*, 200 Mich. App. at 257-58, 503 N.W.2d at 732. Objective notice has been interpreted by the courts to mean that the person who fired the employee

was aware of the protected activity in which the employee engaged.  *Id.  See also, Saloka v. Shelby Nursing Center Joint Venture*, 2005 WL 3394596 at *5 (informing a manager who was not involved in plaintiff's termination that she was going to file a complaint with the state held insufficient to establish that her employer was aware of her intent for purposes of her WPA claim.)

In this case, the evidence shows that Plaintiff told only his fellow drivers that he was thinking about filing a complaint somewhere.  Plaintiff has presented no evidence showing that, at the time of his firing, Martin McNulty or McNulty's supervisor, Tom Stikeleather knew he intended to file an OSHA complaint; he relies only on his subjective belief that he was fired because he discussed the possibility of filing a complaint with his co-workers.  *See* Plaintiff's Dep., pp. 191-192.[10]  Further, Tom Stikeleather testified that prior to his termination, Plaintiff never voiced any complaints or concerns to him about the safety of any vehicles or operations, or gave Stikeleather any indication that he suspected any violation of law.  Stikeleather Aff., ¶ 5. Furthermore, even assuming *arguendo* that Chris Lopez, one of the alleged participants in the driver discussions whom Plaintiff characterizes as a "lead driver," had some management responsibilities, it is undisputed that Lopez was not involved in the decision to terminate

---

[10]  Plaintiff formed the subjective belief because on the day he was fired, McNulty told him that none of the drivers could stand working with him.  *See* Plaintiff's Dep. p. 192.  Plaintiff apparently believes that one of the drivers, therefore, must have told McNulty about the conversations about him thinking about filing a complaint.  But, he has presented no substantive evidence to support this belief.

Plaintiff, and, as noted, Plaintiff has presented no evidence whatsoever to suggest that Lopez or any of the other drivers informed McNulty or Stikeleather that Plaintiff was going to file an OSHA complaint before he was terminated.

For all of the foregoing reasons, the Court finds that Plaintiff has failed to establish that he was engaged in a "protected activity" under the WPA.

Even if the Court were to find that Plaintiff was engaged in a protected activity, his WPA claim fails because he has not presented any support for there being a causal connection between his having planned to file a complaint and his discharge. At best, all that Plaintiff points to is the temporal proximity of his OSHA complaint and his discharge. However, it is well-settled that "a temporal relationship, standing alone, does not demonstrate a causal connection between [a] protected activity and any adverse employment action. Something more. . . is required to show causation." *West v. General Motors Corp.*, 469 Mich. 177, 186, 665 N.W.2d 468 (2003); *Garg v. MCCMHS*, 472 Mich. 263, 286, 696 N.W.2d 646, 660 (2005) (in order to show causation, a plaintiff "must show something more than merely a coincidence in time between protected activity and adverse employment action.").

Assuming *arguendo* that Plaintiff has made out a *prima facie* WPA claim, Defendants have articulated legitimate non-retaliatory reasons for Plaintiff's discharge -- unauthorized use of the computer, appearing for work in biker gear, not having the corrected customer's invoice signed when directed, and showing up late for the scheduled

one-on-one meeting with McNulty, without advance explanation. Therefore, the burden of production shifts back to Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered were merely a pretext for retaliation. *Hopkins v. City of Midland*, 158 Mich. App. 361, 379, 404 N.W.2d 744, 752 (1987); *Roulston v. Tendercare (Michigan)*, *Inc.*, *supra*, 239 Mich. App. at 280-81. To do so, Plaintiff must demonstrate that the evidence in the case is sufficient to permit a reasonable trier of fact to conclude that Plaintiff's protected activity was a motivating factor in the adverse action taken by the employer. *Jennings v. County of Washtenaw, supra*, 475 F. Supp. 2d at 714; *Hazle v. Ford Motor Co.*, 464 Mich. 456, 465, 628 N.W.2d 515 (2001). "A plaintiff can prove pretext either directly or by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Roulston, supra* at 281, 608 N.W.2d 525, citing *Hopkins v. Midland, supra*, 158 Mich. App. at 380, 404 N.W.2d 744. Plaintiff here has made no attempt whatsoever to show that the reasons given for his termination were pretextual.

For all of the foregoing reasons, the Court will grant Defendants' motion for summary judgment on Plaintiff's WPA claim. Count III of Plaintiff's Complaint, therefore, will be dismissed.

## C. PLAINTIFF HAS FAILED TO STATE A LEGALLY COGNIZABLE WORKERS' COMPENSATION RETALIATION CLAIM

The Michigan Workers' Disability Compensation Act, M.C.L. § 418.301 (the

"WCDA"), prohibits retaliating against an employee for filing a claim under the under the Act. In pertinent part, the WDCA provides:

> A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

M.C.L. § 418.301(11).

A retaliatory discharge claim under the WDCA, however, cannot be based on the employer's discharge of an employee because of the employer's anticipation that the employee might file a workers' compensation claim. *Griffey v. Prestige Stamping, Inc.*, 189 Mich. App. 665, 473 N.W.2d 790 (1991); *Wilson v. Acacia Park Cemetery Ass'n*, 162 Mich. app. 638, 645-46, 413 N.W.2d 79, 82-83 (1987) ("The statutory provision prohibiting retaliatory discharge in M.C.L. § 418.301(11); M.S.A. § 17.237(301)(11). . . prohibits discharge or discrimination only in retaliation for *prior* claims for workers' compensation benefits. [Therefore,] we hold that retaliatory discharge premised upon the employer's anticipation of a future claim does not state a legally cognizable cause of action." *Id.* (emphasis in original)). Providing an employer with oral notice of an on-the-job injury is not enough to constitute the exercise of a right under the WDCA. *Lavigne v. Dow Chemical Co.*, 2010 WL 1711153, *10 (E.D. Mich., Apr. 28, 2010). This is precisely all that Plaintiff in the instant case can establish. He told Defendants Austin and McNulty that he had injured his arm -- four days after the injury -- and that they

immediately directed him to go a doctor and get it looked at. [Plaintiff's Dep., p. 109.] He further admitted that Austin or McNulty instructed him to fill out an incident report, and that he "would be remiss" if he did not. *Id.,* p. 110. Plaintiff, however, never filled out an incident report. *Id.*[11] Then, when he finally went to a clinic, although he apparently informed the clinic that he was injured at work, he failed to insure that the clinic had the correct employer information. *See* Defendant's Ex. 7. Therefore, Heritage never received a bill for Plaintiff's medical treatment. Plaintiff having only provided Defendants with oral notice of his on-the-job injury, and Heritage never having received any sort of workers' compensation claim from, or on behalf of, Plaintiff, Defendants could not have retaliated against Plaintiff for exercising his rights under the WDCA as a matter of law.

For the foregoing reasons, Count 6 of Plaintiff's Complaint will be dismissed.

### D. PLAINTIFF HAS FAILED TO ESTABLISH AN FLSA CLAIM

29 U.S.C. § 207(a)(1), provides that, in general, an employee who works more than forty hours per week is entitled to overtime pay at a rate of one and one-half the employee's normal hourly rate. To make out a claim of violation of the Act, an "FLSA plaintiff must prove by a preponderance of evidence that he or she 'performed work for which he [or she] was not properly compensated.' " *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 602 (6th Cir. 2009); *Myers v. Copper Cellar Corp.*, 192 F.3d 546,

---

[11] He claims that he was never given a form to fill out (but he also did not ask for one). [Plaintiff's Dep., pp. 109-110.]

551 (6th Cir.1999) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superseded by statute on other grounds* as stated in *Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C.Cir.1972)).  To determine the extent of damages, the plaintiff can "prove his or her 'under-compensation' damages through discovery and analysis of the employer's code-mandated records." *O'Brien v. Ed Donnelly Enterprises, supra*; *Myers v. Copper Cellar Corp., supra*.  "However, if the employer kept inaccurate or inadequate records, the plaintiff's burden of proof is relaxed, and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage estimate." *Id.* (citing *Mt. Clemens Pottery*, 328 U.S. at 687-88, 66 S.Ct. 1187).  This relaxed standard, however, only applies where an employer keeps inaccurate or inadequate records.  *O'Brien v. Ed Donnelly Enterprises, supra*, 575 F.3d at 602-03.  It is only where employer records are lacking that an FLSA plaintiff does not need to prove the amount of uncompensated work, and can then estimate his damages, shifting the burden to the employer. *Id.*

Plaintiff admitted in his deposition that to keep track of his time, Heritage required that he punch a time card.  Plaintiff's Dep. p. 202.  Plaintiff further admitted the amount of overtime he worked would show on his time cards.  *Id.*  However, he admitted that he did not examine the time cards in reaching the conclusion that he was owed overtime.  Rather, he simply estimated the overtime he thought he worked and calculated what he thought he should have been paid based upon that estimate.  [Plaintiff's Dep. pp. 202-03.]

This is insufficient to establish a *prima facie* FLSA claim and insufficient to shift the burden to Heritage to rebut Plaintiff's allegations. *O'Brien v. Ed Donnelly Enterprises, supra*. (The relaxed standard adopted by the Court in *"Mt. Clemens Pottery* does not help plaintiffs show that there was a violation under the FLSA. It would only allow them to prove damages by way of estimate, if they had already established liability." 575 F.3d at 603.)

**E.      PLAINTIFF IS NOT ENTITLED TO DAMAGES FOR VIOLATION OF COBRA'S NOTICE PROVISION**

COBRA requires plan administrators to provide continued health insurance coverage to covered employees and their qualified beneficiaries, and to notify them of their right to elect continuation of such coverage upon the occurrence of a "qualifying event." 29 U.S.C. §§ 1161, 1166. Termination of employment is one such "qualifying event." 29 U.S.C. § 1163(2). where, as here, the employer is the plan administrator, the employer has forty-four days from the date of the qualifying event to notify qualified beneficiaries of the right to continued coverage. 29 C.F.R. § 2590-606.4. *See also, Roberts v. National Health Corp*, 963 F. Supp. 512, (D.S.C. 1997), *aff'd*, 133 F.3d 916 4th Cir. 1998). Here, it is undisputed that Plaintiff's employment was terminated on October 24, 2008. He received the notice of his COBRA rights on December 27, 2008, 64 days later.

The purpose of the civil enforcement provisions of COBRA is, above all, to put plaintiffs in the same position they would have been in but for the violation. *Burgess v.*

*Adams Tool & Engineering, Inc.*, 908 F. Supp. 473, 478 (W.D. Mich. 1995) (citing

*Bartling v. Freuhauf Corp.*, 29 F.3d 1062 (6th Cir. 1994)).  Here, Heritage paid

Plaintiff's medical insurance premiums through December 31, 2008, and sent Plaintiff his

COBRA notice "much earlier in the month."  [Plaintiff's Dep., p. 206 ("I received it on

the 27th of December, and it was dated much earlier in the month.")]  Plaintiff, however,

did not receive that notice until December 27.  Plaintiff admitted at his deposition that

neither he nor his family was denied medical care or insurance coverage.  He further

admitted that he was not harmed by the delay in getting the notice:

> Q:    How have you been harmed by not getting that notice?

> A:    It was -- it was just a -- it was wrong. . . .

*Id.* p. 207.

Arguably, Plaintiff has no claim whatsoever of a COBRA notice violation since he

admits the COBRA packet he received on December 27 was dated "much earlier in the

month" or "some two weeks earlier" than December 27, suggesting that Heritage timely

complied with the statute by sending the packet within the 44-day period allowed.

However, even assuming *arguendo* that Heritage technically violated the statute,

imposition of a penalty for a COBRA notice violation is a matter within the discretion of

the court.  29 U.S.C. § 1132(c)(1).  In the absence of any prejudice to the plaintiff or bad

faith withholding of COBRA paperwork on the employer's party, courts decline to

impose penalties for non-compliance with COBRA's notice requirements.  *See e.g.,*

*Burgess v. Adams Tool & Engineering, Inc.*, 908 F.Supp. 473, 478 (W.D. Mich.1995) (refusing to impose penalties where plaintiffs failed to show evidence of prejudice or bad faith); *Boucher v. Williams*, 13 F.Supp.2d 84, 105 (D.Me.1998) (declining to impose penalties under § 1132(c)(1) where plaintiff failed to show he suffered any harm or prejudice due to lack of notice and did not suggest that defendant's failure to notify him of his rights was intentional or demonstrated bad faith); *Daneshvar v. Graphic Technology, Inc.*, 40 F. Supp. 2d 1225, 1243 (D. Kan. 1998).

The Court here, too, declines to impose a penalty upon Heritage for not timely providing Plaintiff with notice of his COBRA rights. Plaintiff admits he was not harmed or prejudiced in any way by his tardy receipt of notice from his former employer of his COBRA rights. He has not suggested that Heritage intentionally withheld sending him his notice. Furthermore, he was provided continued medical coverage through December 31, i.e., for more than two months after his termination. Under these circumstances, the Court finds that Plaintiff is not entitled to any damages for Heritage's tardy COBRA notification.

## **CONCLUSION**

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motions for Summary Judgment **[Dkt. Nos. 26 and 27]** are GRANTED. Accordingly,

IT IS FURTHER ORDERED that this case be, and hereby is, DISMISSED, in its

entirety, with prejudice.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated: July 29, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 29, 2010, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager